```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                   ORLANDO DIVISION

 3              Docket No. 6:12-cr-63

 4  . . . . . . . . . . . . . .
    UNITED STATES OF AMERICA    :
 5                              :         Orlando, Florida
             Plaintiff          :         March 21, 2013
 6                              :         9:00 a.m.
                  v.            :
 7                              :
    JONATHAN PAUL JIMENEZ        :
 8                              :
             Defendant          :
 9  . . . . . . . . . . . . . .

10

11                  TRANSCRIPT OF SENTENCING
            BEFORE THE HONORABLE GREGORY A. PRESNELL
12                UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15

16  For the Plaintiff:  Roger Handberg

17

18  For the Defendant:  W. Drew Sorrell, II

19                      Amanda Jacobson

20
    Court Reporter:     Sandra K. Tremel, RMR/CRR
21                      407-245-3110

22

23

24  Proceedings recorded by mechanical stenography, transcript

25  produced by computer-aided transcription.
```

```
 1              P R O C E E D I N G S
 2         THE COURT:  Okay.  Lisa, if you will call the
 3  case.
 4         THE DEPUTY CLERK:  This is in the matter of United
 5  States of America v. Jonathan Paul Jimenez, case number
 6  6:12-cr-63-Orl-31GJK.
 7         THE COURT:  Okay.  And appearing for the
 8  government.
 9         MR. HANDBERG:  Good morning.  Roger Handberg on
10  behalf of the United States.  With me is Robert Manson with
11  the FBI and to his right is Don Metzger with the IRS.
12         THE COURT:  All right.  Thank you all.
13      For the defendant?
14         MR. SORRELL:  Good morning.  Drew Sorrell for
15  Mr. Jimenez.  To my right is Amanda Jacobson who you
16  appointed conflict counsel in this case.  And to my right
17  and behind me is Shawn O'Toole, also an attorney with our
18  office.  Obviously to my immediate right is Jonathan
19  Jimenez, the defendant.
20         THE COURT:  All right.  Thank you.
21         MR. SORRELL:  Yes, sir.
22         THE COURT:  Well, we're here today for a
23  sentencing in this matter.  And it's pronounced Jimenez not
24  Himenez?
25      Mr. Jimenez, pled guilty to counts one and two of the
```

1  indictment in this case charging him with basically tax

2  fraud and making a false statement to the government.  And

3  in connection with the matter Mr. Salce has prepared a

4  presentence report dated March 14th that I have reviewed.

5  And also have a sentencing memorandum appearing at document

6  number 137 prepared by defense counsel which I've also

7  reviewed.

8       There were some preliminary legal issues involved in

9  this sentencing.  Have those been resolved or is there

10  anything I need to consider at this time?

11       MR. HANDBERG:  I believe all the sentencing issues

12  have been resolved, Your Honor.  We originally scheduled it

13  for three hours which we don't need because all the evidence

14  we expected to introduce, we don't need to.  Those issues

15  have been resolved.

16       MR. SORRELL:  The only issue that is outstanding

17  as far as the motion to compel and that was basically a

18  motion to compel government to produce information about the

19  schools that were overseas in Mauritania.  Your Honor

20  entered an order on the case saying you can carry that

21  motion until today.  And that's I think the only outstanding

22  motion that we would ask for, that information to be

23  produced because it may have had an impact on how we

24  prepared for today.

25       THE COURT:  All right.  Well, let me go ahead and

 1  hear what's involved in that issue.  And Mr. Sorrell, why

 2  don't you take the podium there and tell me what you need

 3  and why you think you need it, and we will go from there.

 4      MR. SORRELL:  Your Honor's already read my

 5  sentencing memorandum, so I'm not going to spend too much

 6  time on details unless you have questions, of course.

 7      The core -- one of the core issues in this case is that

 8  the government has suggested or basically said that

 9  Mr. Jimenez was not in fact preparing to go overseas to

10  study at a religious school but instead was preparing to go

11  overseas to learn to commit final jihad.  We believe that

12  the government should produce to us any information that it

13  has related to that school as to whether they say it exists,

14  it doesn't exist, if it's actually a terrorist training camp

15  or something different.  That has not been produced.  I

16  believe the reason is that there are -- having had

17  conversations before I filed my motion, concerns on the

18  government part -- government's part as to it being a

19  classified -- classified information.

20      Part two of that request was seeking information

21  related to the alleged terrorism facilitation training and

22  travel network that Mr. Robertson, the co-defendant, was

23  alleged to have had engaged in, run, whatever you would like

24  to call it.  Also, that information is information we would

25  have liked to have had for purposes of preparing for today's

1    sentencing, the implications being that if there is no proof

2    of anybody actually having traveled, been recruited, et

3    cetera, that would have an impact on how we would have dealt

4    with sentencing.

5         The first part of that obviously I'll repeat, which is

6    information about the school, lack thereof, whatever it

7    actually is, is or is not in the government's hands would

8    also have had an impact on how we prepared.  That's the

9    reason for the motion, Your Honor.

10             THE COURT:  All right.  Mr. Handberg?

11             MR. HANDBERG:  Thank you, Your Honor.

12        During the course of this case, as we have outlined in

13   some of our filings, we produced voluminous discovery with

14   respect to the investigation that was conducted.  And in

15   that discovery there's certainly information about other

16   individuals and what individuals say with respect to the

17   school that they say exists over there.

18        Mr. Sorrell is right, you know, his request potentially

19   could implicate the Classified Information Procedures Act.

20   You know, and I think for our purposes it's neither here nor

21   there.  He wants to say that there's a religious school over

22   there.  I'm not going to quibble with that.  And Your Honor

23   can, you know, can take that for whatever it's worth.  I

24   don't think it's going to be, frankly, a relevant factor in

25   this case one way or the other.  We don't have any

1  sentencing issues.  The terrorism enhancement applies.  And

2  whether he's one person or one of more than one person,

3  it's -- I don't think is going to impact the sentencing in

4  this case.  And, you know, if Your Honor based on that wants

5  to, you know, hear in their favor in some respect, I mean

6  that's certainly going to be your prerogative.  That's

7  certainly the argument I would expect them to make.

8      So, you know, under the Classified Information

9  Procedures Act there's limitations on, you know, productions

10 of -- the types of information they have requested we

11 produced, what we have produced, and if they think that

12 there's a gap that results as a result of that, I would

13 expect them to argue it.

14     THE COURT:  All right.  My sense is that the

15 government has produced more information in connection with

16 this sentencing than just about any sentencing I'm familiar

17 with, and that's a credit to Mr. Sorrell and his defense

18 team.

19     It also seems to me that the concrete information

20 requested by the defendant is not terribly germane.  It

21 seems to me is what Mr. Jimenez thought he was doing, not

22 whether there was a school or if there is a school, what

23 that school actually does.

24     So -- and I also tend to agree with Mr. Handberg that,

25 Mr. Sorrell, you could use that absence of information to

1  mitigate, argue your mitigation point.  But at this stage, I

2  don't see a necessity to compel the government to produce

3  that information.  If I change my mind by the end of the

4  proceeding, I'll let you know.

5          MR. SORRELL:  Thank you, Your Honor.

6          THE COURT:  Okay.  All right.

7      Well, let's kind of review the bidding here then.

8  Start with the PSR.  Any factual objection to the content of

9  PSR by either party?

10          MR. HANDBERG:  Not by the United States, Your

11  Honor.

12          MR. SORRELL:  Your Honor, with the caveat that we

13  just dealt with our motion to compel, otherwise there's no

14  objection.

15          THE COURT:  Okay.  Well, with that reservation

16  anyway, let's look at the scoring.  This is my first

17  occasion to deal with this enhancement, but we have a base

18  of 14.  I'm looking at page 9 of the PSR.  And then there's

19  this 18 level enhancement under 3A1.4 which kicks the score

20  up to 32 -- well, it actually kicks it up to 32 and you back

21  into 18.  And then it also kicks up the criminal history

22  category from 3 to 6, I believe.

23      I understand there will be Booker-related arguments in

24  relation to the reasonableness of that, but is there any

25  objection to the scoring itself, Mr. --

1              MR. HANDBERG:  Not from the United States.

2              MR. SORRELL:  No, Your Honor, not from

3    Mr. Jimenez.

4              THE COURT:  All right.  Okay.  Well, there being

5    no objections to the factual content of the PSR, the Court

6    adopts those statements as its findings of the Court and

7    determines that the advisory guideline score is a 29,

8    criminal history category VI.  That calls for a term of

9    imprisonment between 151 and 188 months; one to three years

10   supervised release; restitution in the amount of $5,587

11   which I understand is the tax loss; a fine between $15,000

12   and $150,000; and a $200 special assessment.

13     Okay.  With that benchmark in mind, Mr. Sorrell, I'll

14   be happy to hear from you and your client, and we'll go from

15   there.

16             MR. SORRELL:  Your Honor, I would be remiss if

17   didn't introduce Mr. Jimenez's family.  The blonde lady

18   behind me to my right is Lilian Bowley who's Mr. Jimenez's

19   mother, and to her left is Jerome Bowley who is also

20   Mr. Jimenez's father -- I should say stepfather.  Both of

21   them are here, obviously, to observe and to make it clear to

22   the Court that they're loved ones and they are very

23   concerned about their son.

24             THE COURT:  Thank you.

25             MR. SORRELL:  Mr. Jimenez -- when you read the PRS

1   and you talk to him starts down, frankly, a path that this

2   Court has dealt with before because I have seen it.  The

3   path is he grows up -- grow up, becomes addicted to drugs.

4   His drug abuse basically was the abuse of PCP, angel dust as

5   it's sometimes called, as well as alcohol.  He, despite

6   that, and despite the fact that he spent quite a bit of time

7   in I'll call them mental institutions dealing with some

8   mental issues that were defined with the use of PCP or,

9   frankly, the two are related.  Which caused the other, is

10  unclear exactly.  But he starts on a path that you have seen

11  before.  What it doesn't lead to is a little bit shocking to

12  me in the sense is that you don't see a dramatic criminal

13  history in this case.  What you see is one prior conviction

14  for robbery.  There's some other things related to it, but

15  simply put, it's a simple robbery.  It's not even an

16  aggravated robbery, at least what I can tell from the

17  documents that we have.  And we also have an outstanding

18  theft of government services count which hasn't been

19  sentenced yet, which is out of Philadelphia, I believe.

20  Again, doesn't seem to be a very significant criminal event,

21  for lack of a better term.

22      So you've got Mr. Jimenez who then later turns up in

23  Florida, and the question is why is he in Florida and why is

24  he not still in New York or Philadelphia, more or less where

25  he's from?  And the answer to that is a gentleman by the

name of Mustafa -- Mustafa El Hanafi.  Mustafa is a Muslim

living up in New York.  Frankly, he has no -- his own

criminal history, but is involved in the Muslim community up

there and takes Mr. Jimenez at a relatively early age under

his wing.  And Mr. El Hanafi will say -- this is another

issue that we asked for Mr. Hanafi to be here so he could

testify directly to this, but I'll proffer to the Court what

he would have said, which is that he was concerned that

Mr. Jimenez is a drug addict, he has no means, no prospects,

doesn't really because of these issues have access to the

traditional schooling that most of the rest of society does,

just a matter of fact.  And so he says to Mr. Jimenez, I'm

going to send you down to Florida and I want to you live

with a person by name of Mr. Robertson.  And Mr. Hanafi's

point in sending him down here, he would say, was to get an

education about who Mr. Jimenez is to Mr. Jimenez, teach him

more about himself, teach him about his religion, hopefully

get him out of the drug environment that he found himself in

to get a better start.

        So you move down to, well, how'd we get here.  And how

we got here is, frankly, kind of a noble reason, if you

will.  Then we have the next big fact in this case which is

that a confidential informant who's nickname or his code

name was Hydra.  And I looked up Hydra and it turns out that

Hydra is actually a comic-book terrorism organization.

1      So Hydra, who also happens to be a convicted felon, a

2  murderer, and a drug dealer is secreted into the life of

3  Mr. Jimenez and befriends him.

4      What we then have and, Your Honor's already alluded to

5  it, are 44 or 45 disks of conversations, documents and

6  paperwork that Mr. -- well, I should say a confidential

7  informant created in that he was talking constantly and

8  visiting constantly with Mr. Jimenez.  And, frankly, I'm not

9  going to go into the conversations, but needless to say,

10  they're not -- not conversations that anybody would want to

11  make on the record.  They're certainly not conversations

12  you'd ever want to make to the FBI.

13      So fast forward, Mr. Jimenez is living with his

14  grandmother at this point, and he is arrested by the FBI.

15  The charges are that he has engaged basically in tax fraud.

16  He filed a fraudulent tax return.  Tax return was

17  essentially claiming two of the children of Mr. Robertson as

18  his own dependents, and the net result of that was about

19  $5,500 worth of -- I should say a 5,500 of a tax return.

20      If asked, Mr. Jimenez would I think say that he spent

21  it basically having a good time.  The other part of that,

22  which there was some left over, I think about $4,000, here's

23  where he begins to travel over to Mauritania for a religious

24  education.  And that's where, depending how you see things,

25  things diverge a little bit.

1       Part two.  The other count that's pending against

2   Mr. Jimenez is for -- to put it in street terms -- lying to

3   the FBI.  And if you review the conversations of the

4   confidential informant and you put those up next to the

5   phone call that I believe it was Special Agent Thuman and

6   Mr. Special Agent Manson had with Mr. Jimenez, it's pretty

7   clear, because they're on tape, that Mr. Jimenez said

8   certain things to the confidential informant, that he later

9   in fact denied having made to the FBI.  And that is what

10  gives rise to the second count which is providing false

11  information to a governmental entity.

12      The thing that is worth considering in that case,

13  however, in the second count, is that if you listen to how

14  the FBI set up the phone call, it is abundantly clear that

15  they knew exactly what they were doing, that there was no

16  question whatsoever that they knew when they asked him these

17  questions because they're basically reading from a script,

18  that he had said these things.  And they also -- and I think

19  I said in my memo, as sure as the sun was going to rise,

20  knew that Mr. Jimenez was not going to be able to because of

21  who he is, either keep quiet, not answer the questions to

22  the FBI or frankly say, yes, I said those things.  Just

23  wasn't going to happen.

24      And so you have the FBI making statements to

25  Mr. Jimenez like we have just a few more questions.  If you

 1  could just help clear this up.  And once you've answered

 2  these questions we're about to close our file and you will

 3  never hear from us again.

 4      Again, doesn't make his statements to the FBI non

 5  criminal, but it definitely suggests to me that it was a

 6  manufactured situation.

 7          THE COURT:  What did -- how did the FBI preface

 8  this whole conversation with him?  I mean, was the lead-in

 9  to it?

10          MR. SORRELL:  The lead-in basically was we talked

11  to you before, and -- this is a little more background for

12  you -- when you listen to these disks of conversations, it

13  is clear that Mr. Jimenez was spoken to by the FBI in person

14  early on in their investigation.  They spoke to him up in

15  Philadelphia.

16          THE COURT:  In their investigation of

17  Mr. Robertson?  I mean, is this kind of --

18          MR. SORRELL:  I think they are investigating both

19  him and Mr. Robertson and everybody related to those folks.

20      And so the conversation with the FBI, again I suspect

21  but do not know because I have not been able to question

22  them, one of the Special Agents, but I suspect that they

23  were listening to the conversations that Mr. Jimenez had

24  after he spoke to them the first time where, I believe, he

25  would have been asked about all of these events.

1   Mr. Jimenez says on tape:  I talked to the FBI but I was

2   drunk at the time and I don't really know how they could say

3   anything about that because I was drunk.

4       So then what you then see happen is the secondary phone

5   call that, again, if you actually know kind of outside the

6   scope of living in the life of being called by the FBI, you

7   can look at the tapes and know what's going on, truly is a

8   scripted phone call.  It's the "We've talked to you before,

9   you know we're investigating Mr. Robertson, here are the

10  questions we've got for you, if you answer our questions,

11  you will never hear from us again."

12      And so in one sense it's a manipulation of the reality

13  of what was going to happen when they called him.  They had

14  no need, in my opinion, to call Mr. Jimenez to ask him "did

15  you make these statements?"  The reason being is because

16  it's all on tape.

17      And so the second count is in one sense piling on.  And

18  you've read my sentencing memorandum so you will know

19  providing material aid to a terrorist is its own charge.

20  That charge carries a 15 year maximum sentence.  If you take

21  the case that we have before us where there's a count for

22  tax fraud and a count for lying to the FBI, and you add into

23  that the way the sentencing guidelines work when there's a

24  statutory maximum involved, they basically say, whereas if

25  the two are normally combined as a single group you put

1   them -- you calculate them currently.  If, however, the

2   sentence is so long that you're not going to come anywhere

3   near -- this is again lay terms of putting it -- you're not

4   going to come near to what the statutory max would be,

5   you're butting up against that, put them as consecutive.

6        And so the way this has been calculated is you have a

7   consecutive sentence of two charges that normally would be

8   grouped as a single charge and now you've got a statutory

9   max of 18 versus a statutory max of what could be 10.

10       So if you think about it, if they had actually charged

11  directly with terrorism, the stat max would've been 15.  But

12  because they've not charged him directly with that because

13  the way the sentencing guidelines work you end up with --

14  this is kind of a debate -- but I don't think it's in play

15  here -- a statutory max for the government of 18.

16       So moving forward.  There's a case that Judge Conway

17  dealt with which was U.S. v Cani or "CanI" which is 545 F

18  Supp 2d. 1235.  And the quote that I draw your attention to

19  is at 1242.  In this case it's kind of a -- it's a very

20  different fact pattern and what it is about is the Bureau of

21  Prisons determined that heroin was being snuck into the

22  federal facility in Ocala.  And so they find a confidential

23  informant who is serving a life term in Ocala to cooperate.

24  And this confidential informant finds a fellow convict,

25  fellow inmate, who has a heroin problem.  And he has a prior

relationship with the heroin addicted fellow and says to
him, I want to sell you some heroin.  And the gentleman who
has the heroin problem to begin with says basically, I'll
take the heroin, and here's the deal.

Fast forward.  Confidential informant turns in the
person that he sold the heroin to, government then
prosecutes the gentleman for basically possession of heroin
in a federal facility which is, you know, simple possession
is one thing but doing it inside of a federal prison is a
much different thing as far as sentencing is concerned.

Judge Conway looked at those factors and said basically
the following:  The government exerted a sort of a pressure
on Cani, which is the drug addict, although in Cani's
situation the government's actions did not rise to the level
of entrapment, Cani's addiction to heroin likely made him
more susceptible of being involved in a transaction
involving that substance.

Then it goes on to say, Jones -- who was the
informant -- was serving a life sentence was able to engage
Cani in the controlled transaction as easily as he did
because of the prior relationship with the Cani.  The
government was able to use that prior relationship to entice
Cani, who is nearly finished serving his prison term, to
participate in the transaction.

Now the reason I -- I'm reading to the Court is because

1  it's basically the same situation but a different set of

2  facts which is --

3         THE COURT:  What was the year of that?

4         MR. SORRELL:  2008, Your Honor.  So Judge Conway

5  basically observed the government set up a situation that it

6  was almost certain to have this outcome, and it was in

7  essence a situation that didn't have to be.  And what I'm

8  saying is that in this case, there's no question that

9  Mr. Jimenez said the things he said.  There's no question,

10 because he's admitted it, that the tax return was prepared

11 and that it was an unlawful.

12     What didn't have to happen is the government reaching

13 out to Mr. Jimenez to set up a situation where you were

14 almost certain to have him lying.  A street person is not

15 going to say to the FBI:  I said terrorist things.  Just not

16 going to happen.

17     We spent quite a bit of time in our sentencing

18 memorandum talking about the effect of the terrorism

19 enhancement.  But I'm just going to quickly go through that.

20 Again, if you collapse the providing false statements with

21 the tax count into a single group, you end up with a natural

22 sentence basically of 21 months at the low end, as I recall.

23 If you provide in this case the terrorism enhancement, the

24 21 month low end is multiplied by a factor of 10.  So the

25 guideline becomes 210 months.  Only after you add back in or

1   I should say deduct down for the acceptance of
2   responsibility do you get into the true score, if you will,
3   in this case which is roughly 12 and a half years to 15 and
4   a half years, a little bit longer than that, but that's a
5   plus or minus.
6       That sentence, to my mind, for what actually occurred
7   in this case is exceedingly long.  No one was actually hurt.
8   And I fully admit the Eleventh Circuit case law says that
9   this type of enhancement deals with the inchoate problems.
10  But the reality of the situation is nobody actually got
11  hurt.  Nobody actually went overseas, nothing really
12  happened except the filing of a false tax return.  And as I
13  have said in ersatz situation with the FBI.
14      We have looked at this sentence and tried to come up
15  with, from our position, what a more fair approximation
16  should be and what I think is that -- and I have said it in
17  my memo -- nine years to me seems to be fair because that's
18  a little bit more than three times the underlying natural
19  scoring.  It addresses the harm, it addresses the 3553
20  factors which are Mr. Jimenez's youth, his prior drug
21  addiction, which frankly is what the U.S. vs. Cani case in
22  the main is about.  It also adjusts, as I appreciate this --
23  the probation officer in this point in his document to you,
24  Your Honor, it appreciates the fact that while he -- he,
25  Mr. Jimenez -- doesn't quite qualify for a diminimus role in

1   a downward adjustment because of that, he was allegedly,

2   according to the government, a recruit, not necessarily a

3   ring leader in this case.  And so the 3553 factors, again, I

4   think could take that into account.

5       So that's -- that all is the basis for why we're saying

6   or requesting nine years at the most.  That is still a

7   lengthy sentence.  It is going to result more than likely

8   that Mr. Jimenez is going to be in prison when his

9   grandmother dies.  He's very close to his grandmother.  And

10  it I think serves the ends of justice in that it recognizes

11  that the things for which he is accused are very serious and

12  still results in, frankly, a very serious length of time

13  that he's going to spend in federal prison.

14      Unless Your Honor has any questions, I'll close with

15  that.

16          THE COURT:  No, I don't have any questions at this

17  point, so thank you, Mr. Sorrell.

18          MR. SORRELL:  Yes, sir.

19          THE COURT:  Does Mr. Jimenez wish to say anything

20  now or he can wait until the end or whatever you --

21          MR. SORRELL:  Why don't we wait until the end,

22  Your Honor.

23          THE COURT:  Okay.

24          MR. SORRELL:  Thank you.

25          THE COURT:  Mr. Handberg.

```
 1              MR. HANDBERG:  Thank you, Your Honor.
 2         According to Jonathan Jimenez, al Qaeda existed in
 3    Orlando.  It existed in the form of Marcus Robertson who
 4    Jonathan Jimenez said was an al Qaeda recruiter.  Robertson
 5    was someone Jimenez knew since he was a teenager.  Jimenez
 6    came down to Orlando to learn from Mr. Robertson.  When he
 7    came he was taught in the ways how to kill people, how to
 8    use weapons, because the goal was and the plan was for him
 9    to go overseas to engage in violent jihad.  He was going to
10    go to a place in west Africa.  He was going to go to an al
11    Queda based camp there from which he would commit violent --
12              THE COURT:  I'll give you an opportunity to --
13    take all the time you want, Mr. Sorell.  I can see you're
14    agitated there, but this is the other side of the coin, so
15    listen to it.
16              MR. SORRELL:  Yes, Your Honor.
17              THE COURT:  Sorry, Mr. Handberg.
18              MR. HANDBERG:  No need to apologize, Your Honor.
19         Defendant in this case presents a danger.  He presents
20    a danger unlike that of, frankly, a lot of the other
21    defendants we see in the course of our cases.  And Your
22    Honor's an expert on sentencing, has sentenced many, many
23    defendants, and I know you have said many times in my cases
24    that it's the hardest thing that you have to do as a federal
25    judge is sentence somebody, because you have to take all
```

 1  these factors that the defense and the prosecution put

 2  forward.  And what I want to talk about in response to the

 3  defendant's sentencing memo and the defense comments and

 4  what I expect that they're going to say in the rebuttal time

 5  is the factors related to this investigation, the factors

 6  since Mr. Jimenez was arrested that we think show that he is

 7  a danger unlike that of many other defendants in this case.

 8      First, a point of clarification.  This was not a case

 9  that was devised by the FBI where a confidential source was

10  targeted or directed at Mr. Jimenez to try to get him to say

11  extremist things.  As is evident from the discovery in the

12  case, as it is evident from the court filings and the search

13  warrant, this was a case where, frankly, the FBI having

14  sources paid off because one of those sources happened to be

15  at the right place at the right time in November of 2010

16  when Mr. Jimenez came down to live with Mr. Robertson.  And

17  when that happened, the source was present when Mr. Jimenez

18  started talking about wanting to be one of Osama Bin Laden's

19  go-to guys, when he started talking about the plan for him

20  to go to Mauritania.  And as the investigation developed,

21  the FBI did as you would expect:  They recorded

22  Mr. Jimenez's statements.

23      So, yes, the confidential source in this case has a

24  criminal history.  The confidential source in this case was

25  a paid informant of the FBI.  But you can't impeach a tape

1    recorder.  The tape recorder has no criminal history.  The

2    tape recorder is not getting paid for doing what it's doing.

3        And what's laid out in the presentence report and

4    what's laid out in the discovery in the case, was laid out

5    in the search warrant affidavit and the other filings is a

6    consistent set of statements by Mr. Jimenez about what

7    Mr. Robertson was teaching him to do.  This wasn't just sort

8    of generic talk about extremism, hopeful goals about Jihad.

9    That's there.  Those comments are there.  But there's also

10   very specific comments about Mr. Jimenez talking about the

11   specific training that he's getting from Mr. Robertson when

12   he's in Orlando.

13        THE COURT:  Could I ask a question here?

14        MR. HANDBERG:  Yes, sir.

15        THE COURT:  Either one of you -- and I'm not going

16   to sentence Mr. Jimenez to today because I want some time to

17   review all this in more depth.

18        MR. HANDBERG:  Yes, sir.

19        THE COURT:  And I thought we were going to be

20   longer today.  So we will get back together at your

21   convenience.

22        But is there an indication of what Mr. Jimenez's motive

23   was?  I mean, most of these people have some reason:

24   Revenge or get even with society or that sort of thing.

25   What started him on this path toward talking Jihad?  And

```
 1    I'll be happy to hear from Mr. Sorrell -- both -- either one
 2    of you or both.
 3            MR. HANDBERG:  Well, Mr. Sorrell can go first.
 4    I'll go next.
 5            MR. SORRELL:  I don't know in the disks that I
 6    have seen that there is any indication from the government's
 7    evidence what the motive would have been.
 8            THE COURT:  Okay.
 9            MR. HANDBERG:  Well, the motive we know we know
10    from Mr. Jimenez, because during the course of this case,
11    prior to any discovery being turned over, prior to anything
12    being public about the travel facilitation network part of
13    the case, he told somebody.  He told another inmate what the
14    plan was.  And the beginning part of what I said, that all
15    comes from what Mr. Jimenez told somebody.  And what Mr.
16    Jimenez told that person was, you know, Mr. Robertson put
17    the idea in his head that he should go overseas and engage
18    in violent Jihad.
19            THE COURT:  So he's just a dumb foot soldier doing
20    what he's told because he doesn't know any better?  I mean,
21    I guess maybe you all don't have an answer to that.  But
22    that troubles me.  I just...
23            MR. HANDBERG:  I don't know -- because what I
24    think you're asking, Your Honor, is you would really have to
25    get inside Mr. Jimenez's head on that.
```

1          THE COURT:  Well, no, the tapes could have

2     revealed.  I mean, he could say Christians are infidels; we

3     got to kill all the Christians.  I don't know what his

4     motivation was.  That's what I'm trying to find out.  Maybe

5     there's no indication of that in the tapes.  That's all I'm

6     asking.

7          MR. HANDBERG:  You know -- well, I mean, there's a

8     lot of extremist things in the tapes about, you know, him

9     wanting to do these things.  I'm trying to remember from all

10    the tapes out there if he says, well, I want do this

11    because, you know -- you know, Jim Smith one day said

12    something that made me mad, now as a result, I hate all

13    Christians.  I want to get back at them.

14        You know, I mean he talks about, you know, he's got

15    extremist views, you know, when he calls people -- I may get

16    some this terminology wrong -- I think it's a kafir or fucar

17    you know, infidels.  I mean, he does have that sort of

18    verbiage in those tapes.  I mean, that's something he

19    believes and that is something that's certainly motivates

20    him.

21         THE COURT:  All right.  Well, I didn't mean to

22    interrupt but anyway, Mr. Sorrell, you can certainly tell

23    me -- give your thoughts on that at the end.

24         MR. HANDBERG:  So in the recordings beyond the

25    extremist statements, we have over the course of several

months statement after statement of how Mr. Robertson is
training Mr. Jimenez.  January 24th, 2011, Jimenez states
that Robertson wants to teach him how to learn about Islam
first and then teach him how to kill.  Jimenez's tadpole
who's going to continue to study until Robertson decide he's
ready to travel overseas.  Jimenez explained to the
confidential source how Robertson was providing the
paramilitary style training to include tactical and room
clearing, troop leading maneuvers, training on kill moves
such as the guillotine choke, talking about what to do when
law enforcement came to get him.

    January 29, 2011, another recorded conversation, his
goal is to study one day fight, die in the battlefield.
Robertson's teaching him about the basics of knife fighting,
tells him he's going to learn weapons.  Robertson wants him
to become deadly with his hands prior to learning how to
fight with weapons.  Jimenez's conditioning his body to be a
weapon so he'll be prepared to strike deadly points and
learning how to be dangerous with a knife to cut someone up.

    January 2 -- January 31, 2011, another recorded
conversation.  Jimenez stated Robertson wants to him cleanse
himself of his sins in the event that he is going to jump
off and die.

    February 5, 2011, another recorded conversation.
Jimenez talking about putting his training from Robertson to

use one day.  Talks about how Robertson's going to take him
to shooting to the shooting range where he's going to
continue his weapons training.

February 26, 2011, another recorded conversation,
Jimenez telling the confidential source how Robertson wants
to send Jimenez overseas to his people with guns.  He said,
I send you with my people.  I'm sending you with guns.  You
know what I'm saying:  Uzis.  Talks -- goes on from there.

February 26, 2011, another conversation recorded.
Talking about how Robertson wants him to fight to kill.
Robertson teaches Jimenez it's obligatory to kill military
officers, specifically generals because they can lead the
Army.  Tells him don't tell anybody that.

Same day, Robertson training Jimenez on firearms
including how to properly handle and conceal them.

April 7, 2011, another recorded conversation.  Jimenez
explaining how Robertson instructed him on how to kill
people and in a good manner and how to do it with kindness.

When he finishes the religious aspects of his training
Robertson's prepared to make him a killer.

April 10th, 2011, another recorded conversation.
Jimenez talking about how Robertson was training Jimenez on
how to transition from a firearm to a knife when close to
the enemy.  Teaching Jimenez to shoot a B.B. gun, explaining
magazine ammunition capacity, magazine release.

1      April 20, 2011, Jimenez talking about how he wants to

2  be --

3           THE COURT:  What I'd rather do is just read what

4  you're reading to me.

5           MR. HANDBERG:  And I can file it, Your Honor,

6  because what I did was in some of the filings in the case,

7  you know, a lot of this stuff is summarized.  I have just

8  put in the chart-type form.  I can certainly file it with

9  the Court if you would like to have that.

10          THE COURT:  Well, I'm a better reader than I am a

11  listener so people reading to me is hard for me to stay

12  focused.  I'd much rather just read what you're reading.

13          MR. HANDBERG:  Well, and the basics of it is over

14  the course of four months, time after time after time the

15  confidential source not prodding Mr. Jimenez into going to

16  Mauritania to do this.  He is recording what Mr. Jimenez is

17  talking about what Mr. Robertson is training him to be able

18  to do.

19          THE COURT:  Let me ask you this, Mr. Handberg.

20  Maybe you can't answer this.  Why didn't you just charge him

21  with a terrorism crime instead of calling him and basically

22  setting him up for count two?

23          MR. HANDBERG:  Well --

24          THE COURT:  I mean, the FBI already knew all the

25  answers, so they knew he was going to lie to them basically.

1              MR. HANDBERG:  Well, I guess I disagree with that

2    characterization, Your Honor.  There was a lengthy interview

3    with Mr. Jimenez.  I think it was on August 23 of 2011.

4    That's when the search warrants were executed at

5    Mr. Robertson's residence.  Mr. Robertson at this point was

6    arrested for being a felon in possession, and an interview

7    was conducted of Mr. Jimenez.  And like a lot of those

8    interviews there were ebbs and flows and back and forths.

9    And at some point the interview ended.  And it is in my

10   opinion a very common law enforcement tactic when you have

11   somebody who you're trying to get to acknowledge the reality

12   of their situation, to acknowledge what has happened to when

13   you interview them again, use their own words to trigger

14   that memory in their head that, yes, we're just not asking

15   these questions because we don't know the answers.  Let's

16   use some of your own words and see if that will maybe

17   convince you that we know what we're talking about.

18       So I don't think -- I disagree with the

19   characterization that it was a set up where he had no choice

20   but to lie to the FBI.

21              THE COURT:  Okay.  Well, modify that part and

22   answer my question.  Why didn't you just charge him with

23   being a terrorist?

24              MR. HANDBERG:  I have charged him with what I have

25   been allowed to charge him with, Your Honor.  And he

benefits as a result of that because the violation in the
search warrant -- there were two predicates for the search
warrant.  One was the felon in possession; the other was not
the material support provision, but a violation of section
956 which is conspiracy to commit murder, maim or destroy
overseas.  And that's a life felony.  And if he had been
prosecuted for that or if he was prosecuted for that and the
terrorism enhancement applies he's at offense level 45 prior
to acceptance of responsibility.

So I do disagree with the concept that he is in some
ways worse off as a result of the prosecution that he is
facing.  He is actually much better off than he would be had
he been facing those charges before Your Honor here today.
And that's just the reality.  So he has benefited from it,
and that's how he's in front of you.

THE COURT:  Okay.  Thank you.

MR. HANDBERG:  So it's not a situation where this
is all some plan by the FBI to insert a confidential source.
The confidential source is just at the right place at the
right time.  And through the good work of the FBI, yes, the
only reason no one was killed, the only reason that Mr.
Jimenez didn't go overseas was that the FBI was on the case.

And that's what they're supposed to do.  That's what
you would expect them to do, to not let it go to its
fruition.

1        So the facts of the case support the guidelines

2   recommendation of the sentencing guidelines.

3        This is a case where we're talking about individuals

4   who are trying to go overseas to engage in violent jihad.

5   They say it's not just a one time drunken conversation.

6   It's something that over the course of months is detailed.

7        And then we have Mr. Jimenez's conduct after he's

8   arrested, after he's arrested and he comes to Orlando he

9   immediately wants to have a psychiatric evaluation.  And

10  what we see from him is, is an effort to, in my opinion,

11  manipulate the system.  So he gets his request granted.  He

12  gets to go down for his psyche evaluation and that's where

13  he meets the person who I have summarized some of the --

14  some of his statements.  And there he very transparently is

15  malingering.  He says stuff like, I think judges where black

16  robes because they engage in black magic.  I think they --

17  when they asked him about his charges he intentionally

18  confuses them with credit card charges and electrical

19  impulses.  He's somebody who's trying to get an evaluation

20  that he's incompetent or insane so he doesn't have to face

21  the charges.  Well, obviously BOP knows how to evaluate

22  people, they know how to listen to jail calls, they know how

23  to figure out that he's just malingering.  And that's an

24  effort by him to manipulate the system.

25        He also does more devious things to try to manipulate

1   the system.  He proposes to have the confidential source in

2   the case killed.  The FBI receives the note that Mr. Jimenez

3   provided to someone with "snitch" and the name of

4   confidential source, COD, Marcus Robertson, cash on demand,

5   Marcus Robinson, presumably, and details some of the efforts

6   that he has to kill the source.  And his plan at one point

7   is to come back to Orlando, get bond, go out there, find the

8   source, kill him himself.  He still wants to commit violent

9   jihad.  So he's going to try to go overseas to do that.  And

10  he can't do that, he's just going to do something here.

11      So even after his arrest, even after interviews with

12  the FBI and contact with the FBI, his plan is still the same

13  as it was before.  There's nothing about him that is changed

14  in the course of this -- in the course of this

15  investigation.

16      From his actions during the course of the investigation

17  in terms of what he wanted to do, from his actions after he

18  was indicted, after he was arrested, the fact that he still

19  wants to this day commit violent jihad and he wants to do

20  these acts shows that he is -- he's a danger.  And I

21  certainly appreciate how the defense thinks that in this

22  case nine years would be appropriate, but someone like Mr.

23  Jimenez, I do agree, I mean he's a recruit.  And in some

24  respect that mitigates, but in some that makes him -- that

25  makes him scary.  Makes him very scary.  Because he's the

1  sort of person who's going to go overseas, as he said and,

2  you know, suicide bombings is permissible.  He's the sort of

3  person who would do something like that.  I mean, he'd

4  rather bang the iron, he'd rather shoot people he says, but

5  he's willing to follow the orders even when the orders when

6  they require him to engage in violent jihad.  And this is

7  something that's continued throughout the course of his

8  time.  Even when he's talking to people who aren't the

9  confidential source, he's talking to some female at one

10  point in July of 2011.  You know, he tells her, well, you

11  know, I'm going to -- I'm a warrior.  There's months at a

12  time I'm going to go to the desert in Mauritania in Morocco.

13  And we know what that -- we know what that means.  You don't

14  go to the desert in Mortania, Morocco, to go study.

15       This isn't a student who's trying to go overseas to

16  further his education.  This is someone who's got an

17  extremist plan which he's evidenced throughout the entire

18  course of this case.  He's not reformed in any way.  And he

19  presents a danger.  And whatever period of time you sentence

20  him to is a period of time that we don't have to worry about

21  whether or not we're going to have a confidential source

22  into him at some point to find out what his plans are.  And

23  we're not going to have to worry about whether or not

24  someone's going to come forward and tell us what his latest

25  plan is to commit violence and mayhem.

1        He's a danger.  It's a serious case.  And we would ask

2   for a sentence at the high end of the guideline range, Your

3   Honor.  Thank you.

4            THE COURT:  Okay.  What's the status of

5   Mr. Robertson's case?

6            MR. HANDBERG:  We have -- he has pled guilty to

7   the felon in possession.  His trial I believe is set for

8   June or July.  We've got a hearing in late May, I believe,

9   Your Honor.  He had filed a motion in limine with respect to

10  some co-conspirators statements.

11           THE COURT:  So what charge is he being --

12           MR. HANDBERG:  He's pending on the same false tax

13  claim charge that Mr. Jimenez has pled guilty to.  Count one

14  of the indictment.

15           THE COURT:  Okay.

16           MR. HANDBERG:  And he's pled guilty in a prior

17  case.  He pled before Your Honor straight up January of 2012

18  and we don't have a sentencing date for that.  So he's pled

19  guilty to one case and he's pending trial in another case.

20           THE COURT:  Would it make sense for the sentencing

21  judge to hear the facts of that before we sentence Mr.

22  Jimenez?

23           MR. HANDBERG:  I don't think so, Your Honor.

24           THE COURT:  All right.  Thank you, Mr. Handberg.

25           MR. SORRELL:  I think I should be clear, Your

1   Honor, Mr. Jimenez without waiving the motion to compel as

2   to the travel network and people that allegedly were

3   involved in this travel network or the school, again the

4   caveat, he didn't waive that motion, he did agree for

5   various reasons with the probation office and the government

6   that he was not going to object, which we've already not

7   objected to the information -- I should say to the terrorism

8   charge itself.

9           THE COURT:  You mean the terrorism enhancement?

10          MR. SORRELL:  Enhancement.  I'm sorry.  I

11  misspoke.

12          THE COURT:  I understand.

13          MR. SORRELL:  The arguments I am making relate

14  basically to the 3553 factors and trying to put all this in

15  context.

16      So you've asked the question what is the motive.  There

17  are literally hundreds of hours of recording.  It has taken

18  us literally months as his defense team to review those

19  recordings.  In all of that time I nor the other attorneys

20  that I have dealt with who have helped me get through the

21  information provided have come across, to my knowledge, a

22  clear statement of why he would want to do the things about

23  which he is talking.

24      When you listen to the recordings, and I don't mean to

25  be unkind, but I'm going to say unkind things, Mr. Jimenez

 1  sounds like a 12 year old.  And the reason I say that is

 2  because when I was about 12 I was fascinated with ninjas.  I

 3  thought there were the coolest thing ever.  When you listen

 4  to these recordings with the confidential informant and Mr.

 5  Jimenez, it is clear that the confidential informant is

 6  goading, in my opinion, Mr. Jimenez into making some of

 7  these statements.  In particular there's at least one where

 8  Jimenez said, I'm not really sure -- I'm paraphrasing of

 9  course -- I'm not really sure I could do that or could die

10  or I could do these things, at which point the confidential

11  informant shockingly says, what is your mission?  And it

12  brings him back to saying I'm a terrorist.  Doesn't say it

13  like that, but basically that's point.  He brings him back.

14  There are other statements that are inconsistent with this

15  idea that he was actually going to go overseas and commit

16  these acts about which he is accused.

17       So why am I saying this?  Because you're left walking

18  away from this wondering:  Is this truly a calculating

19  person who really has this in his mind or is this somebody

20  who is simply talking and saying things he thinks his

21  audience wants to hear, as I said earlier on in this cases,

22  just to chump -- just to thump his chest, look at me, I'm a

23  bad ass.

24       I can't tell you from listening to all these recordings

25  that it's entirely clear why he's doing it.  I do think

1   there's an element of immaturity.  But what I don't think
2   necessarily goes to is what exactly the government is saying
3   which is it is absolutely clear, according to the
4   government, he was going overseas.  I think if you had a
5   confidential informant who hadn't been trying to reach a
6   goal, these conversations probably would have been a lot
7   different.
8        Now, the other thing that Mr. Handberg said that I
9   think is interesting -- and let me preface this by saying
10  I'm not saying that the FBI has done anything illegal.  I'm
11  not saying that they have done anything unprofessional.
12  They have clearly used techniques that have been used over
13  and over again by investigative agencies.  What I am saying
14  is, if they truly were trying, as Mr. Handberg has
15  suggested, to prompt Mr. Jimenez's memory, a better way to
16  have done that would have simply have been to say, don't you
17  recall saying to the confidential informant in this case the
18  following?  Not:  Did you ever say to anybody -- and by the
19  way -- you will never hear from us again once you answer
20  this question -- did you ever say to anybody this?  There's
21  a much better way if you're really trying to prompt memory
22  to do that.
23       The part two of that, I have -- well, I have stated
24  that the charges he is facing are basically overstated when
25  you run out the score to calculate what the sentence is for

 1  guideline purposes.  Mr. Handberg has countered logically

 2  with, if we had charged him directly with a terrorism count

 3  he would have been facing a mandatory life felony and so on

 4  and so forth.  The bottom line is, the government didn't.

 5  They charged him with tax fraud.  They charged him with

 6  lying to the FBI.  That's what's before Your Honor, not

 7  anything else.  So with that, Your Honor, I'll conclude.

 8  I'll conclude with that.

 9      I believe Your Honor's going to take this under

10  advisement as you have indicated previously.  I want to add,

11  if I can, that we request when you do sentence him that you

12  recommend that he is placed in a facility as close to

13  Brooklyn, New York, where his family is, as possible.  If he

14  could be placed in RDAP, I think that would be useful.

15      And the final thing I'd like to say is I think -- I'm

16  not sure if you're ready to hear from Mr. Jimenez.  He has a

17  very short thing to say, Your Honor.

18          THE COURT:  All right.  All right.  Well, let me

19  hear from him and then we will see where we are in this

20  proceeding.

21      Mr. Jimenez, you can if it's easier for you to stay

22  seated.  Pull the mic down so we can all hear you.

23          MR. SORRELL:  I'm sorry, so sorry to interrupt.

24  The other thing Your Honor rightfully pointed out I was

25  getting irritated with Mr. Handberg and that is a true

1   statement.  The reason I was getting irritated because there

2   were statements being made as if evidence had been produced

3   to us, the defense, about what was going on in Mauritania.

4   We still stand on our, I'll say, objection to the

5   non-production of what the government knows or doesn't know

6   about Mauritania.  And as we said previously, I think the

7   Court should presume against the government with respect to

8   that information.

9        THE COURT:  My take on it is I don't have a clue

10  what's going on in Mauritania and that's -- I mean, other

11  than geopolitically.  So I don't know and so that's part of

12  my calculus.  I don't know what's going on in Mauritania.

13     Mr. Handberg?

14       MR. HANDBERG:  Yeah.  I just want to make sure the

15  record is clear on this point.  The part that I was talking

16  about that I think where Mr. Sorrell was irritated, that has

17  been produced in discovery because that is the statements

18  that Mr. Jimenez made to somebody.

19       THE COURT:  What matters to me is what he said,

20  what he thinks, not actually what's going on over there.

21       MR. HANDBERG:  And that's -- just to make it

22  clear:  That is what he said.  That is what he thinks.  And

23  it has been produced in discovery.

24       MR. SORRELL:  And Your Honor, the response to that

25  is clearly what he said and what he thinks is important.  At

```
 1  the same time if there is no framework in reality for these
 2  things to have actually happened, that would be important
 3  for the Court to know with respect to sentencing.  That's my
 4  point.
 5           MR. HANDBERG:  And the significance of the
 6  statements that I started off my part with and alluded to
 7  this a little bit, it's important to know at the time that
 8  that happened, Mr. Jimenez had not been arraigned.  He had
 9  no discovery.  The travel facilitation allegations were not
10  public.  So there was no other source for the person who
11  gave us that information other than Mr. Jimenez.  And in the
12  discovery that's been provided, the summary that's provided,
13  it reads exactly like the 44B notice we provided, with a
14  couple exceptions here and there.
15      So that's what's striking about that, and that's what's
16  striking -- and that's what shows that it's been in Mr.
17  Jimenez's mind the entire time.  It's a constant pattern of
18  expected conduct in terms of the training and going overseas
19  and what's going to happen overseas.
20           THE COURT:  Okay.
21           MR. SORRELL:  I'll not go further.
22           THE COURT:  All right, Mr. Jimenez.
23           THE DEFENDANT:  Yes, sir.
24      Your Honor, I know that outta -- outta -- outta
25  everybody, I know more than anybody in this case what's
```

 1  going on.  The first time in my life before I get to this,

 2  this is the first time ever been clean and sober and clear

 3  minded.  Now first, I will admit as a man that I made those

 4  statements, and I know those statements are very foolish

 5  statements.  And there's no excuse for making those

 6  statements.

 7      First I must say that my intentions was to leave from

 8  where I was in Philadelphia getting into problems to go to

 9  Florida.  In Florida I learned how to read the dictionary.

10  Mr. Robertson -- we intent do martial arts school with

11  Michael Bell to train because I was, you know, out of shape

12  getting all this intoxicants out of me.  Then when I went

13  there that's all I was -- I wasn't studying no Arabic with

14  this man.  We studied how to read the dictionary, how to

15  speak properly, how to have etiquettes, because when he was

16  going to send me to Mauritania these people have different

17  cultures and where I was coming from from the street, this

18  would have been very inhumane behavior.  So I was going to

19  be a protege of him, to sit amongst these individuals.

20      Now mind you, I still had a lot of foolishness in me

21  going to Florida, what I was going through in the course of

22  New York and Philadelphia.  So when I went there my first

23  day I went there we went to the mosque, the prayer place

24  where you perform prayers.  And I was introduced to this

25  confidential informant by Mr. Robertson because

Mr. Robertson was a former Marine and this man was a former

Marine, so he says.  And I can tell you he wasn't a very

religious person.  He had a little bit of, you know, a

street mentality and that's what I still had, so I grasped

to him more because more of individuals there was more

disciplined, well mannered, they didn't get into the

foolishness.  So he grasped to me.

Mind you, whenever I got with him everything was cool.

The first place we went to, even Mr. Robertson said, look,

he didn't come down here for this to make no friends.  He

came down here to get into the studies and stay focused, so

don't waste time with him.  So he says you know, I'll take

him out because when he was going -- he would go to Canada

and Australia to do lectures.  So I couldn't stay at his

family's house because his wives were there, so I would stay

at the mosque.  So at the time he says, Mr. Robertson, he

says, you know, what I'll take care of the little kid, the

young man.  I'll take him out to get something to eat, you

know, make sure he's okay, check up on him because he lived

around there.

So he would check in with me.  The first place he

brought me was to where he worked.  This is downtown I

believe in Orlando by a big McDonald's.  He worked as a

maintenance worker.  And I see him in the conversation -- he

knew where I was from in New York and he was another

1   resident from New York and we would talk about New York and

2   stuff.  So it wouldn't be on a Islamic thing.  And then he

3   would say, hey, you know, Mr. Robertson trains martial arts.

4   I never went to Michael Bell yet, because I was there maybe

5   a week or so, maybe two, three days.  So I said, okay.  So

6   he says, yeah, you know, I'm a Marine.  And then we started

7   getting into those kind of conversations with the military

8   and martial arts.  And, you know, that's something I like,

9   you know.  I always like the military.  And so we would talk

10  about that.  And other statements he would bring it out in

11  me because, mind you, smoking cigarettes, bringing my

12  behaviors -- when I was around Mr. Robertson, he never

13  tolerated none of that behavior.  He was very strict.  He's

14  a militant, but not in an extreme -- never taught me no

15  extreme stuff.  Taught me how to martial arts, especially

16  Mr. Bell, how to run, because he said the reason why I want

17  to teach you this is so you can have a program.  You have to

18  know how to have responsibilities in your life.  You this

19  grown.

20       So the confidential informant, I would be comfortable

21  with him talking about this kind of talk, that I couldn't

22  talk around the other brothers that was in the community.

23  So I know he would understand.  So, when we started getting

24  more cooler, I would stray off from the mosque behind

25  Mr. Robertson's back and go to a bar, score some marijuana,

go to a strip club and I seen by the discovery, because I
didn't know half of the stuff that they have on me.  But I
know, you know, it's in black and white, so I could never
say that I was going through this.  And I put -- when I was
going through with him everything was about military.  He
said, like the SMEAC.  Robertson never told me about the
SMEAC.  This was something he put in my ear.  Then one time
he told me, let's go, I know a place, because he said I did
federal time and I was in the penitentiary and I have a
place so we can go and knock the place off, other terms,
means a home invasion.  Kept putting it in my ear.  I never
made an attempt to do that.  Because what I was trying to do
was impress that man, you know, because he knew that I was
the most -- I was the most closest to Robertson around his
family and he would tell me things, and he says, okay, we
could do this.

    And so one time I called his bluff.  I says, do you
have a firearm?  He said, I don't have a firearm.  He said,
I got a firearm.  You going have to get your own firearm.  I
said, how am I going to get a firearm in Florida and this is
not even where I'm from?  He said, doesn't Mr. Robertson
have a firearm?  I said, I don't know.  He said, well, you
know if he has one, why don't you go get his firearm, let's
do the job, and then put it back.  That's when I started
thinking.  And then I addressed this to the mosque.  I

1   addressed this to a man named Machve.  He was called the

2   businessman, I figure his government name.  A man called

3   Dohul.  He is the security for the mosque.  And

4   Mr. Robertson.  And we discussed this in the room.  I said,

5   this man -- and then also Mr. Robertson says, he been asking

6   me that he could gun traffic guns through here.

7       So he says, you know what I want you to do? I want you

8   to you stay away from that guy and when he comes around tell

9   him that you're not going to Mauritania.  You're not going

10  nowhere.  I'm going with you to New York.  We had a fall

11  out.

12      So then I go back to New York.  I'm waiting for the

13  visa to go.  It never came through.  I lost focus.  I went

14  back to Philly, went back to my old ways:  Drinking, running

15  the streets.  I was at my good friend of mine and this is

16  when the FBI stopped me for the first time.  They came in

17  the house.  I was watching I called 'em my nephews, you

18  know.  I'm real close to his children, close friend of mine.

19  His name is Dex.  And I was watching the children.  They

20  came to the door.  They knocked on the door.  I thought that

21  the child was lying.  He said the FBI wants to -- is asking

22  for you.  So I came.  They said, you know Mr. Robertson?  I

23  never denied it.  I said, yes, sir.  They says, well, we

24  want to ask you some questions about him.  I said, no

25  problem because I was concerned.  Wasn't running.  None of

 1  that.  I says, okay.  Well, they say, can we talk to you?

 2  They say we need to talk to you, you know, real forcefully.

 3  This is my first encounter with the FBI.  It make me

 4  paranoid, you know.  And I say, well, you know, I'm watching

 5  my nieces and nephews.  They was all children around there.

 6  They knew.  They said, well, ain't no one can watch them?  I

 7  said, not at the time, sir.  I said, if you come back around

 8  7:00, my aunt will be here -- not really my real aunt, but

 9  you know.  So I come from the Chinese store.  At that same

10  time, didn't go nowhere.  They came out from the car.  Then

11  brought me to a hotel.  I don't know quote for quote but

12  they asked me questions about it.  They says, your hands is

13  on a firearm.  I know for certain that my hands was never on

14  a firearm, never touch a firearm.

15      So these were the things, the allegations they was

16  putting on me, really pressuring me, beating me in the head.

17  And, mind you, my mind wasn't clear.  And after that I was

18  paranoid after that, you know, I started indulging in more

19  stuff.  But no violence.  I did more destructive stuff to

20  myself and my family, especially my mother and my

21  grandmother.

22      So everything went good.  Something happened and my

23  grandmother -- my grandmother had a -- she got into a car

24  accident and this is my calling because this got me away

25  from the foolishness.  They says we want you to see your

```
 1  grandmother, want you to take care of her, you know, watch
 2  over her.  My uncle Johnny is 92 years old.  So -- excuse
 3  me --
 4      I just got a lot on my mind.  So they sent me.  I went
 5  to Florida with my intentions.  I said, you know what?
 6  There's not meant to be for me.  My calling is I'm going to
 7  take care of my grandmother and be good, you know, stay away
 8  from it, maybe start something in Florida.  I come down
 9  there.  They stop me from the plane, the two FBI officers.
10  They see -- they said I know you ain't want to see our face.
11  I didn't want to see their face.  So I seen them.  I said,
12  look, man, I want to see my grandmother.  My grandmother's
13  coming to pick me up.  Oh, no, we told her that we were
14  going to come pick you up.  So I know my grandmother's 84
15  years old.  Other than that, I would have walked to my
16  grandmother's house.  You know, my grandmother's a old lady.
17  So I said, you know what?  I'm going to deal with you guys.
18  I went there.  They brought me to the Customs.  Came with
19  the same like, you my friend.  I said, okay.  Then they
20  brought me to my grandmother's house, lied to my
21  grandmother's face.  And my grandmother said, she said, my
22  grandson's all right?  And they said, um, they say he didn't
23  do nothing.  He was just around the wrong people.  He's all
24  right.  You know?  And then I'm take care of my grandmother.
25  I'm staying clean.  I'm going to a gym.  I'm not calling
```

 1  nobody.  I'm staying focused.  I'm trying to get my license,

 2  my life together.  Never harmed nobody, man.  And excuse me

 3  for using that slang.

 4      And then my grandmother goes on a cruise, and it hurts

 5  me because my uncle said I don't want to go on the cruise

 6  because I don't feel right because he was getting a little

 7  senile and he couldn't find his passport.  And they was

 8  going to go to an old age home and my uncle said, my

 9  grandson's going to take care of me.  My grandson going to

10  take care of me.  And they go on a cruise.  And these evil

11  individuals come snatch me up.  They take me from my home.

12  And then I found out in the feds that my uncle had a stroke.

13  My uncle had a stroke.  Right?  And I learned that no one's

14  taking care of him.  All his family -- all I got is my

15  mother and my stepfather and my grandmother.  My whole other

16  family is phony, man.  My grandmother's 84 years old by

17  herself, got a messed up knee.  My uncle is by hisself and I

18  know he knows I'm in here.  He didn't know I'm in here.  But

19  I know he knows my grandson would have never left him.

20      So I said, um, when I got hit with this charges, I seen

21  the individual in the feds, I don't know what was going on.

22  I gave him my paperwork, you know?  I'm a little educated in

23  the slam.  I was the imam there telling brothers how to

24  pray, you know, real Islam, peace, living away from

25  foolishness.  And that's why I said I feel ashamed of myself

1  all the statements that I would have been reading with the

2  clear mind what I said.

3      And I showed them my paperwork.  He said, how do you

4  know this stuff?  Because I wasn't really educated with

5  spelling, reading.  And I said, I said, nah, man.  He said,

6  man, you know about Islam.  I said, yeah, man.  You know,

7  brothers was stealing and stuff.  And you could -- they can

8  even have -- they said what one guy -- all those Muslims in

9  that facility can vouch for me that I was the imam and I was

10  preaching righteousness and that was one individual because

11  he was a new convert and I gave him my paperwork.  I says

12  that everything that I know, Mr. Robertson taught me that.

13  My uprightness, my etiquettes, the way I talk, my manners.

14  So he flipped that around.  And I told him about

15  Mr. Navario.  I says, man, I can't understand how a man

16  would get -- would do that to me.  He knows he wasn't no

17  terrorist, man.  You know, the man teaches -- teaches

18  Arabic.  Whatever he did in the past -- don't get me

19  wrong -- when I read about that man's past, it messed me up.

20  The man has a very vicious, violent past.  I don't know that

21  man for that past.  I know him for what he did for me.  What

22  Mustafa did for me.  When they took me they tried to -- they

23  tried to help me, man.  And I would have died on the

24  streets.

25      To be honest with you, Your Honor, I'm glad I'm here

1    because I would have probably died in those streets, getting

2    high right now, who knows where I would've been.  So in a

3    way, I thank God it's a blessing in a way.

4         So then he flipped all that around.  And I remember

5    this statement, I was even on my -- he said, yeah, well, you

6    know, I'm the top drug dealer.  He was called

7    methamphetamine.  I'm top this.  You want me to knock him

8    off?  Kill him?  I said, man, what are you talking about,

9    man?  I said, nah, man, I said sometimes you have to

10   forgive, you know?  He said, I would never forgive him like

11   that.  So I see how they flipped it all around.  I see the

12   games they play, you know.

13        And after that, they brought me to -- I never been in

14   no problem since I have been in jail, sir.  They done try to

15   destroy me.  They brought me to the federal holding, I was

16   okay.  It was the dorm in the Orange County.  Then they

17   played the mind games and put me in a max 1-I, all capital

18   murders, everybody got murder charges.  I'm in there with

19   all kind of animalistic individuals, you know?  No problems

20   in there.  People fighting every day.  No problems.  No

21   fighting.  You can ask anybody 1-I.  All those individuals,

22   they said, man, that dude pray.  That dude stay out of

23   trouble.  He don't gamble.  He doesn't do nothing.

24        Then after that they bring me to the sixth floor where

25   I'm inside of a closet 23 hours a day.  Still no problems

1    from no officers, no talking back, people kicking on the

2    door, masturbating to woman, all kind of obscene behavior.

3    No problems.

4        My mother couldn't even see me yesterday.  My mother

5    came all the way here from New York and I wasn't even able

6    to see her, and I see here through a screen.  And I didn't

7    say nothing.  I didn't ask for no corporal.  I said, you

8    know what?  Maybe, you know, this is the way it is.  I went

9    back and then I'm here -- I'm here right now, sir.  And

10   that's why I never went to trial, because as a man, I want

11   to -- I accept my responsibility for saying those

12   statements.  I know that those statements were not only

13   obscene to my country as an American citizen, you know, and

14   especially as a Muslim, I feel ashamed of myself saying that

15   a Muslim saying this stuff because any doctrine, if you read

16   about Islam, Mohammed never preached none of this sick

17   demented extremism.

18       So I mainly feel ashamed of myself as saying I'm a

19   Muslim.  That's mainly.  And in front of my Lord because the

20   Muslim is looking terrible right now.  And one Muslim looks

21   bad on the nation.  And that's what I feel ashamed of.

22       So I'm making amends to know that I take my full

23   responsibility, and whatever you give me, I have to accept

24   it.  I have to accept it.

25       And that's why I didn't want to go through all this

1  extra stuff.  The young -- the lady right here wanted to

2  help me try to get the appeal back.  I said, you know what?

3  What am I going to go to that extreme for if I know it's the

4  truth.  I know I said those things.  But for one thing,

5  though, regardless if nobody believes me, I know deep inside

6  myself, because I know I got to go to sleep at night.  I

7  know Mr. Sorrell said keep it short and just say sorry, but

8  this is my life, Your Honor.

9      This is my life right here.  I have two children that I

10 never been a father in their life.  My mother, the first

11 time that I'm really in a relationship with my mother and my

12 stepfather, I got to be incarcerated.  And this is a shame.

13 My sister, I got more closer to her behind here than home.

14     So the main thing is I have to go to sleep at night.

15 And I know for certainty that I never made no attempt to

16 hurting nobody.  I never made intentions to hurt nobody.

17 And just to put on the record, if I was going to any

18 terrorist camp, why didn't they follow me and I would have

19 lead them right into the terrorist camp?  They would have

20 found a whole bunch of terrorists.  Mauritania they said the

21 desert -- see, one thing about a desert, when you're an

22 individual from a city lifestyle, it's a lot of

23 distractions.  I get distracted, I'm going to be honest.  I

24 get distracted.  That's why being behind the wall, they

25 helped me making me do 23 hours a day because they have me

1   focus on myself.

2       Mauritania is not a place to live.  If you look on the

3   thing when it shows the population, people live up to 40

4   years old, 50 years old.  Mauritania was a place that they

5   are known for the Koran and the recitation of Koran because

6   that's all they do is they recite Koran.  They're very good

7   for reciting.  There's no TVs.  There's nothing.  So all you

8   have to do is focus on that.

9       So this is the reason why I came to Florida for him to

10  condition me mentally, physically and spiritually for that

11  terrain, because the average person from the city is going

12  to go to New York like Mustafa says when he went to

13  Mauritania, and his son is over there right now too, Your

14  Honor.  He was my friend, and I was supposed to go over

15  there and we were supposed to rent an apartment.  He is

16  right there right now and he sent an envelope and a letter

17  to me, a letter to me from Mauritania about two, three weeks

18  ago, he sent a letter to me, to Orange County from

19  Mauritania, the same individual that I was going to --

20  this -- this -- it's called the Madrasa.  It's -- it's --

21  it's a Koran class, a school.  Mostly it's children because

22  it's uncommon for a person my age not to memorize that Koran

23  because they memorize from when they're children up in India

24  and other places.

25      So to leave off with this, sir, I sincerely apologize

 1   to the Court and you as a Honor, to the FBI and, um, that's

 2   all I have to say, Your Honor.

 3        Thank you.

 4            THE COURT:  All right.  Thank you, sir.

 5        Any concluding comments, Mr. Sorrell?

 6            MR. SORRELL:  Your Honor, I'm not going to say

 7   anything substantive.  I want to tell you, convey to you I

 8   realize this is problematic, the family has requested they

 9   kiss their son.

10            THE COURT:  That's up to the marshals.  I don't

11   have any authority over that.

12        All right.  Mr. Handberg, any final comments?

13            MR. HANDBERG:  No, Your Honor.

14            THE COURT:  I think one thing I need to do is

15   listen to some of these recordings.  I don't know how to go

16   about doing that.  I don't want to listen to 100 hours.  I

17   don't have time to do that.  Maybe the two of you can get

18   together and give me what you think is a reasonable sample,

19   an hour or two, I don't know whatever you think.

20            MR. HANDBERG:  That -- I don't think that will be

21   a problem.  I know Mr. Sorrell already has some clips that

22   he has selected and I can certainly do that as well.

23            THE COURT:  All right.

24            MR. HANDBERG:  We'll make it the greatest hits

25   version so you don't have to listen to --

1          THE COURT:  I'll listen to as much as you think I

2     should.  If there's any dispute, just let me know.  I'll try

3     to resolve it.

4          MR. SORRELL:  Yes.

5          THE COURT:  Then I'll reset the conclusion of this

6     at a time convenient to you all.

7       I may not see the family again, so I want to thank the

8     family for being here.  I know this is difficult

9     circumstances for you and your presence here is meaningful

10    to Mr. Jimenez and to us as well.  So thank you very much.

11      Anything else then before we adjourn?

12          MR. HANDBERG:  No, Your Honor.  Thank you.

13          MS. JACOBSON:  If I may briefly.  You appointed me

14    previously as conflict free counsel, specifically as to the

15    issue of withdrawal of the plea.  I have met with my client

16    and I don't believe that the Court or my client needs my

17    services any further, although I'm happy to stay if you'd

18    like me to remain for the sentencing.  I just wanted to

19    advise the Court that I believe my purpose has been

20    fulfilled.  I have meet with Mr. Sorrell, spoken to him

21    several times and with the client as well.

22          THE COURT:  Mr. Sorrell, do you have any objection

23    to that?

24          MR. SORRELL:  I do not, Your Honor.

25          THE COURT:  All right.

1          MS. JACOBSON:  Happy to remain on, Your Honor, if

2    you'd like me.  I don't mind at all.

3          THE COURT:  Well, I don't think there's any reason

4    to.  Let me see what Mr. Jimenez says.

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  It's okay with you?

7          THE DEFENDANT:  Yes, sir.

8          MS. JACOBSON:  He'd like me to stay.  He'd like me

9    to continue on.

10          THE COURT:  That's fine.  You have been involved

11   to this extent.  There's no reason not to have you stay on

12   until the end.

13          MS. JACOBSON:  I just wanted to give you an

14   update.  I think I fulfilled what you asked me to do.  I'm

15   happy to stay.

16          THE COURT:  I appreciate it.  Why don't you stay

17   on until the end, at least until the next step.

18          MS. JACOBSON:  Yes, Your Honor.

19          THE COURT:  Okay.  Thank you.

20          (sentencing concludes at 10:22 a.m.)

21               C E R T I F I C A T E

22          I certify that the foregoing is a correct

23   transcript from the record of proceedings in the

24   above-entitled matter.

25   s\Sandra K. Tremel          May 3, 2013