Page 1

```
 1               UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
 2                    ORLANDO DIVISION

 3
       - - - - - - - - - - - > CASE NO:   6:12-cr-63-
 4     UNITED STATES OF         :           Orl-31GJK
       AMERICA,                 :
 5                              :
           Plaintiff,           :
 6                              :
       vs                       :
 7                              :
       JONATHAN PAUL JIMENEZ,   :
 8                              :
           Defendant.           :
 9     - - - - - - - - - - - >

10

11
           TRANSCRIPT OF:       SENTENCING HEARING
12
           BEFORE:             HONORABLE GREGORY A.
13                             PRESNELL
                               Judge of the Court
14
           DATE:              April 18, 2013
15
           PLACE:             U. S. District Court
16                            401 West Central Avenue
                              Orlando, Florida
17
           TIME:              9:30 a.m. to 10:20 a.m.
18
           REPORTED BY:       Sandra Y. McGauley, CSR,
19                            CP, CM, Certified
                              Shorthand Reporter
20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3        ROGER HANDBERG, III, ESQUIRE
          400 West Washington Street, Suite 300
 4        Orlando, FL  32801
 5             Appeared on behalf of Plaintiff
 6

 7        W. DREW SORRELL, II, ESQUIRE
          AMANDA JACOBSON, ESQUIRE
 8        SEAN O'TOOLE, ESQUIRE
          Lowndes, Drosdick, Doster,
 9        Kantor & Reed, P.A.
          450 South Orange Avenue, Suite 250
10        Orlando, FL  32801
11             Appeared on behalf of Defendant
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1                    I N D E X

2                 April 18, 2013

3   HEARING BEFORE THE HONORABLE GREGORY A. PRESNELL

4                                          PAGE

5    CERTIFICATE OF REPORTER                    36

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           Transcript of proceedings held on April

2    18, 2013, commencing at 9:30 a.m., at United

3    States District Court, 401 West Central

4    Avenue, Courtroom 5A, Orlando, Florida, before

5    the Honorable Gregory A. Presnell, Judge of

6    the Court, reported by Sandra Y. McGauley,

7    CSR, CP, CM, Notary Public, State of Florida

8    at Large.

9           THE COURT:  Good morning, everyone.  Be

10    seated, please.

11           Let's call the case.

12           THE CLERK OF THE COURT:  This is in the

13    matter of United States of America versus

14    Jonathan Paul Jimenez, Case Number

15    6:12-Criminal-63-Orlando-31-GJK.

16           THE COURT:  All right.  And appearing for

17    the Government?

18           MR. HANDBERG:  Good morning, Your Honor.

19    Roger Handberg on behalf of the United States.

20    With me is Robert Manson with the FBI and Don

21    Metzger with the IRS.

22           THE COURT:  All right.  Thank you,

23    gentlemen.

24           For the Defendant?

25           MR. SORRELL:  Good morning, Judge.  Drew

1      Sorrell, for the Defendant.  Also, Mr. Jimenez

2      is with us to my right.  To my further right

3      is co-counsel, Amanda Jacobson, and behind me

4      is also co-counsel, Sean O'Toole, and also

5      joining us in the gallery would be the parents

6      of Mr. Jimenez, Lillian Molley and Jerome

7      Molley.

8             THE COURT:  All right.  Thank you.

9             We're here today for a continuation in the

10     sentencing in this case.  Last time we got

11     together, after a good bit of discussion, one

12     of the primary issues seemed to be to what

13     extent Mr. Jimenez was sincere, I guess, to

14     use that word, in his -- in the statements he

15     made to the confidential source as to whether

16     he meant what he said or was he merely being

17     braggadocio, or whatever, and so I felt that I

18     couldn't really resolve that based on hearsay,

19     so to speak, from counsel and probation.

20            Having read some of the excerpts, I wanted

21     to hear for myself and so I asked counsel to

22     prepare excerpts for me, which they did, and

23     which I've listened to.

24            In addition, I have -- I reviewed the

25     transcript from the last session.  I also

```
 1    received this morning a handwritten letter
 2    from Marcus Robertson.
 3         I don't know.  Have you seen this,
 4    counsel?
 5         MR. HANDBERG:  I have not, Your Honor.
 6         THE COURT:  It is short.  Take your time
 7    and look at that while I kind of get myself,
 8    my act together up here.  I've read it.
 9         You can just put that in the probation
10    file now that we've all read it.
11         In addition to that, counsel for the
12    parties, as part of their submission to me of
13    the excerpts of the recordings, also gave me
14    supplemental written materials containing kind
15    of their take on what they were giving me and
16    how the excerpts were selected and, of course,
17    I've read that as well.
18         So, I think that's pretty good summary of
19    what I've done since the last, our last
20    session.
21         I'll be happy to hear from counsel again,
22    not repetitive in nature; but, if there is
23    something else you want me to consider before
24    I proceed with sentencing, I'll be happy to
25    hear it.
```

1      So, you can both take as much time as you

2   need.  I don't care who goes first.

3      MR. HANDBERG:  Well, Your Honor, I'm not

4   going to cover what's in the sentencing memo,

5   because I know you've read that.  I was trying

6   to address, I think, some of the questions you

7   had.

8      When I was looking at it again last night,

9   there is one thing I don't want to have lost

10   in connection with this sentencing.  We spent

11   a lot of time talking about the false

12   statement charge; but, there are two charges

13   in this case to which the Defendant pled

14   guilty.

15      I do a lot of white-color cases.  I do a

16   lot of tax cases.  It is probably the case

17   that I've had with probably the smallest tax

18   loss ever; but, in some respects, to me, it is

19   probably one of the most significant tax cases

20   I've had, because there is nothing more

21   abhorrent than the realization that someone is

22   defrauding the United States Government to get

23   money to then use to fund a purpose, which one

24   of the intents is to kill American military

25   personnel overseas.

1          I know we spent a lot of time talking

2     about the false statement charge last time;

3     but, we didn't really talk about this false

4     claim conspiracy.  I know Your Honor is aware

5     of that and will consider that in the

6     sentencing; but, I just wanted to point that

7     out and ask that that be considered, because I

8     don't think I covered that sufficiently in my

9     sentencing memo.

10          Thank you, Your Honor.

11          THE COURT:  Mr. Sorrell?

12          MR. SORRELL:  Your Honor, I apologize, I

13     have a lot more to say than that.

14          THE COURT:  That's fine.  I've got all

15     morning.  I've got another sentencing in an

16     hour and a half.

17          MR. SORRELL:  I won't be that long, Your

18     Honor, I promise.

19          THE COURT:  Okay.

20          MR. SORRELL:  As Your Honor knows, like

21     all of us, I did not have the brief of the

22     Government, the supplemental brief, I'll call

23     it, of the Government, to provide kind of the

24     point/counter point that sometimes goes on in

25     court papers.

1    So, I thought it was important for me this

2    morning to address some of the excerpts that

3    the Government points to in support of its

4    case.

5    I think it is important to remember, too,

6    that, as we discussed a lot last time, that

7    the Government never brought forward the

8    evidence as to exactly what is going on

9    overseas, and Your Honor addressed the issue

10   as far as they didn't bring the evidence

11   forward so that's pretty much a presumption

12   against them having the evidence.

13   So, if you take a look at that context, it

14   puts us in a situation where all we have is

15   essentially a confidential source where when

16   you listen to these conversations pulling out

17   information, and frankly, if you read the

18   letter this morning of Mr. Robertson, he kind

19   of makes the same point; but, it is

20   confidential informant pulling information out

21   of Mr. Jimenez.

22   For lack of a better idea as to how to

23   frame this, I'd like to look at briefly points

24   made by Mr. Handberg in his brief page and

25   basically the page order in which they appear

1      in his brief.

2           In page 4 of his brief, there is this long

3      quote where there are talks of terrorism; but,

4      at the end of the quote, it essentially says,

5      Mr. Jimenez:  I'm not ready to die.

6           Page 6 --

7           THE COURT:  He says he's getting ready to.

8      He's working on that.

9           MR. SORRELL:  Well, he goes on to say,

10     Your Honor, as you understand, of course,

11     though, that he's not ready.  The question is

12     would he ever be ready, but for the fact you

13     have this confidential informant push him.

14          At page 6, there is again an excerpt, but

15     the part that jumps out to me is, "Robertson

16     is teaching me about the pen."

17          Why do you need to know about the pen if

18     the only thing you are going to do is go

19     overseas and blow yourself up and try and kill

20     generals?

21          At page 7, there is a quote from

22     Mr. al-Hanafi, who we've -- as Your Honor

23     knows, has requested to come down and be

24     present for this hearing, and we've proffered

25     what we think he would say, but the Government

1     again returns to Mr. Hanafi's statements.  One

2     of the things that they, they the Government,

3     quote to is that Mr. Hanafi says, "The desert

4     ain't no joke."

5          Having talked to Mr. Hanafi, he would say

6     that again, and what he means by that is

7     having lived over there, Mauritania is a

8     third-world country; it is not like you can go

9     walk across the block and there is a hospital.

10    All he basically says is there is a little

11    town with a school as I recall.

12         You go to page 13 and there is the

13    discussion of Mr. Robertson asking

14    Mr. al-Hanafi to hire a person essentially to

15    sit on Mr. Jimenez while Mr. Jimenez is up in

16    New York waiting to go to Mauritania.  That

17    again begs the question; if Mr. Jimenez is a

18    committed terrorist, why is Mr. Robertson

19    concerned about him kind of running loose or

20    amuck in New York?  Why do you have to pay

21    somebody to sit on him?

22         In the same page --

23         THE COURT:  It may be because he spent the

24    $5,000 doing other things.  I don't know.

25         MR. SORRELL:  That kind of goes with the

1    theme, Your Honor, which is Mr. Jimenez is

2    really just a young kid.  He's spending money

3    on things that, if he were a terrorist, he

4    would not be spending money on.

5         On the same page, page 13, there is this

6    conversation about fulfilling his obligation

7    to the Lord.  There is really not much to that

8    except for that statement.  And it is a

9    conversation between Mr. Robertson and

10   somebody that is overseas.  That brings us

11   back to the over-arching issue of we were

12   never really provided with a bunch of

13   information that may or may not exist as to

14   exactly what is going on overseas.

15        But bringing it back to that point,

16   without intending to impugn any other

17   religion, the concept of making haj or in this

18   case, when you are not in Ramadan, Umrah over

19   to Mecca is not unique in one sense to Islam.

20   The concept of getting right with the Lord, as

21   some of my southern preachers would say, is

22   also a Christian tradition.

23        So, for instance, if you have a Roman

24   Catholic Church, you have to make confession;

25   you have to cleanse your soul.  If you are a

1    Baptist, you have to be baptized.  All these

2    things should be and must be accomplished

3    before you die.

4         That conversation with Mr. Robertson and

5    the overseas gentleman, who we don't know his

6    name, fits in with that.  There is no

7    conversation or explanation that the reason

8    for that is that he's going to become a

9    terrorist.

10        Part two, excuse me, page 16,

11   Mr. Robertson is again talking to

12   Mr. al-Hanafi.  Mr. Hanafi's son is overseas

13   in Mauritania at this alleged school that

14   we've been talking about and Mr. Robertson

15   says, "I don't want Mr. Jimenez to go over

16   there, because he'll be a distraction to your

17   son," and this is at the point where

18   Mr. Robertson has basically said that

19   Mr. Jimenez is not going overseas with

20   Mr. Robertson's blessing as it were.

21        If Mr. Jimenez were going overseas to go

22   to a terrorist training camp, it strikes me

23   that the way you deal with a person who is not

24   with the program, if you are a terrorist, is

25   you kill them.  You don't worry about them

1     distracting other people.

2          Again, the conversation is not consistent

3     overall with this idea of terrorism.

4          There are some statements from the Miami

5     prison situation -- from Miami and the prison

6     down there.  Again, it's an odd situation in

7     that you once again have a guy who is down in

8     a new situation and is concerned about where

9     he will fall, if you will, in the pecking

10    order.  And so, again, we're back to the Chess

11    number.

12         There is an interesting overlap, too,

13    between our briefs and the Government's

14    briefs.  There is this April 4th phone call

15    and the Government spends quite a bit of time

16    quoting from it and basically there is this

17    discussion of if you are going to kill, you

18    should kill somebody with kindness.

19         In listening to that conversation, what

20    you hear is almost a rote recitation of

21    something that might have been dreamed up or

22    read in a novel, and then in the same breath

23    and in the same tone without missing a beat,

24    Mr. Jimenez says, "Do they have any good strip

25    clubs in South Carolina?"

1          Again, the point is, there is no higher

2     thought given to these.  This is not a

3     situation where you've got a terrorist who is

4     committed to some kind of jihad.  This is a

5     young guy who is really just trying to get

6     along.

7          And so, fine, that's all great.  You've

8     got these statements that the Government has

9     given you, that we have given you, that are in

10    some sense ambiguous; but, you have to ask the

11    question, well, is there some kind of

12    over-arching theme that binds it all together;

13    there is something that says one way or the

14    other what's really going on.

15         At page 8 of our supplemental brief, I

16    think we get to that point.  I'll say it's

17    page 8 going over to page 9.  There is taped

18    conversation where Mr. Robertson is urging

19    Mr. Jimenez to go get his driving license.

20    The stated reason for going to get your

21    driver's license is so that, when you return

22    from overseas, you'll have a clean driving

23    record and your insurance will be cheaper.

24         I don't know any terrorists, frankly.  I

25    don't know any terrorists at all; but, if I

1    knew a terrorist, I'm willing to bet the thing

2    at the top of their mind is not whether or not

3    GEICO can give them a better rate.

4         This is completely inconsistent with this

5    over-arching notion and argument that somehow

6    terrorists -- terror is in the making.

7         You then have at page 9, and we've quoted

8    from it, this conversation that goes on

9    between Mr. Jimenez and Mr. al-Hanafi.

10   Mr. al-Hanafi has known Mr. Jimenez, I

11   believe, since he was about fourteen years old

12   and he's now in his mid twenties, and if there

13   is anybody that Mr. Jimenez is going to be

14   candid with, it strikes me that he's going to

15   be candid with Mr. al-Hanafi, who is the one

16   that sent him down to be with Mr. Robertson in

17   the first place.

18        And the reason he's being candid and the

19   reason I think this is important is because

20   the conversation they have is between, in one

21   sense, a mentor and mentee.  And it says you

22   need to get out of here, you need to go

23   overseas, you need to better yourself, you

24   need to get away from the drugs and the women,

25   and that's the conversation that Mr. Hanafi

1    and Mr. Jimenez have.

2         If Mr. al-Hanafi and Mr. Jimenez were

3    having this conversation about what's really

4    going on, and presumably, if it is

5    Mr. al-Hanafi sitting down with Robertson in

6    the first place, Mr. al-Hanafi would know.

7    The conversation would not be you need to go

8    overseas so you can better yourself.  The

9    conversation would be you are going overseas

10   to kill people, and that's not the

11   conversation that was had.

12        That then brings us down to, as

13   Mr. Handberg was addressing, Count I is the

14   tax count.  It's small.  It just is.  It

15   results, as we've said many times, I think,

16   about a 27-month sentence in and of itself

17   though enhancement.

18        Then you've got what we want to point the

19   Court to and with respect to Mr. Jimenez is

20   the second count that is an additional eight

21   years onto the statutory max in this

22   particular case, which we have said is

23   manufactured, and I know Your Honor has heard

24   that call.  We have it ready to play again,

25   because I think it is that important, and if

1      you would let us, we would play it for you,

2      Your Honor.

3            THE COURT:  Sure.  Go ahead.  How long is

4      it?

5            MR. SORRELL:  I think it is seven minutes

6      total, Your Honor.

7            THE COURT:  Okay.

8            MR. SORRELL:  Okay.

9            THE COURT:  You don't need her to write

10     this?

11           MR. SORRELL:  No, Your Honor.

12           THE COURT:  We may need to introduce this

13     media as a court exhibit for the record,

14     though.

15           MR. SORRELL:  We can do that, Your Honor.

16           THE COURT:  Mr. Handberg, any problem with

17     that?

18           MR. HANDBERG:  No, Your Honor.

19           THE COURT:  Okay.

20           MR. SORRELL:  Just for the purposes of the

21     record and for the purposes of setting the

22     scene, if you will, this is a recording that

23     was provided to us by the Government of the

24     conversation that was had between Special

25     Agent Manson and Special Agent Thuman and

1    Mr. Jimenez on the phone.  This is the call

2    where they basically walk through the

3    statements that were made, and it starts off

4    with Mr. Jimenez basically walking down the

5    street and talking on a cellphone to a lady

6    and then he switches over to the call with the

7    FBI and with that I'll --

8        (Audio tape was played for the Court and

9    is not herein recorded.)

10        MR. SORRELL:  Thank you, Judge.

11        Again, the point of that, why I made you

12    listen to seven minutes of that, is the fact

13    that there is no disputing that he said these

14    things.  There are recordings of that.

15        There is no dispute that he didn't tell

16    the truth when he was asked by the FBI.

17        At the same time, there is also no dispute

18    that the FBI knew absolutely with a hundred

19    percent certainty that he had made the

20    statements.  There was no investigative

21    purpose.  There was no need.  There was no

22    prompting of memory.

23        It was hey, buddy, buddy, what about this,

24    don't mean to bother you, got to do a little

25    investigation, you'll never hear from us

1     again, let's see what the guy who doesn't know

2     anything about FBI, the investigation, he's a

3     former drug user, there is no sophistication

4     that would permit Mr. Jimenez to know, A,

5     either tell the truth or, B, don't talk to the

6     FBI.

7         And I've cited previously the U.S. versus

8     Cani that's in our briefs earlier.  The point

9     of that simply is that as far as a 3553 and

10    the Court can consider the situation and

11    whether and if, in essence, it was a setup.

12        I'm going to just end rather quickly with

13    some of the other quick points.

14        Mr. Jimenez immediately pled guilty.

15    There is no question that he did his part to

16    kind of move this through the system.  He has

17    a history of drug dependence.  He is youthful.

18    As the probation office has pointed out, in

19    one sense, he played a minor role, if any, in

20    this case.

21        What I would say is that we don't think

22    and we assert to the Court that the terrorism

23    enhancement should get much weight.

24        Obviously, we think, too, that the line of

25    the FBI piece should also be mitigated, if you

1     will.

2          If, however, the Court believes that he

3     was going to become a terrorist, then it seems

4     to me that you also have to accept the fact

5     that he played a minor role and was

6     manipulated by people that were around him so

7     it is either one or the other.

8          In closing, Your Honor, we have asked for

9     nine years or less, frankly, and the reason

10    we've asked for nine years is because that's

11    basically three times what I will call the

12    natural sentence in this case, but for the

13    enhancements.  We think that adequately

14    addresses the severity of what has occurred

15    here.  We think it also addresses the fact

16    that Count II for lying to the FBI, providing

17    false statements to a governmental entity

18    should be rationed down and that's all I have

19    to say, Your Honor.

20          THE COURT:  All right.  Thank you, sir.

21    Mr. Handberg, any rebuttal?

22          MR. HANDBERG:  Obviously, we are talking

23    past each other a little bit with respect to

24    the different presentations you have.  Just a

25    couple points.

1          The May 27th excerpt is a good example.

2     That's the one about murdering quote, and Your

3     Honor was able to listen to and was able to

4     read the transcript, and the key to it isn't

5     that this is somebody who is just trying to

6     impression somebody by talking about

7     murdering.  It's in connection with that he

8     then ties it back to the teaching he's getting

9     from Marcus Robertson.

10          So, he's the one who brings up this

11     concept of how to kill somebody as they are

12     just driving down the street, because

13     obviously this is something that's on his

14     mind, because this is what he's been trained

15     on, and it is Mr. Jimenez who is talking about

16     how Tauba, Marcus Robertson, done told me

17     about it, and the rest of it is talking about

18     the training that he received from Marcus

19     Robertson about conditioning his mind, and

20     that's what a lot of these excerpts are.

21          It is not just somebody saying something

22     that theoretically is never going to happen.

23     It is somebody who traveled to Orlando, stayed

24     with someone specifically for the purpose of

25     getting training, took steps to try to be able

1     to go overseas, got a false tax return to be

2     able to fund it, got the training, very

3     specific training that he says he got from

4     Marcus Robertson.

5          So, this isn't just someone who says they

6     want to be a ninja some day.  This is someone

7     who says they want to do it and is taking

8     these concrete steps to make it happen.

9          How the spiritual part fits into it as I

10    point out in our brief is the spiritual

11    aspects of his training, they are designed to

12    prepare him to become a killer who can go in

13    the battle, to give him the discipline to do

14    stuff that would frankly would otherwise be a

15    natural and that's why Mr. Jimenez says and I

16    quoted in my brief, "That's why I," he's

17    talking about Robertson, "doing with you.  I'm

18    making sure that I get you the ema," which is

19    personal faith, "then I'll teach you how to

20    kill and you know."

21         And that's what this case is about and I

22    think that's what this sentencing is about.

23    This sentencing is about is Jonathan Jimenez a

24    danger, and as evidenced by the evidence in

25    the case and by his post-indictment conduct,

1    we believe he is so we ask for the sentence at

2    the highest.

3         THE COURT:  Thank you, Mr. Handberg.

4         MR. SORRELL:  Your Honor, I'm not going to

5    specifically enter on the judgment with

6    Mr. Handberg on that.  I would just remind the

7    Court Mr. Jimenez has asked to be or, well,

8    has asked for the recommendation he be put in

9    a facility near his family in New York, and

10   then I just normally ask -- and I realize the

11   prison handles this, but Mr. Jimenez has been

12   incarcerated in the Orange County jail for

13   13 months and I want to make sure he gets the

14   credit he deserves for that.

15        THE COURT:  The DOD calculates the credit;

16   but, I don't think there would be any question

17   on that here.

18        MR. SORRELL:  Then I guess the last time

19   is drug treatment program while in prison.

20        THE COURT:  I'll be happy to do that.

21        MR. SORRELL:  Thank you, Judge.

22        THE COURT:  Mr. Jimenez, do you wish to

23   say anything else?  I know you had a long, a

24   long dialogue with me the last time; but, I'll

25   hear anything else you have to say.

1         THE WITNESS:  I just want to say again I

2    apologize, sir, for my behavior.

3         THE COURT:  All right.  Well, I, you know,

4    I've had the opportunity to think about this

5    myself since we last got together and I've

6    done a lot of sentencings in the last 12 years

7    or so.  This is -- I mean they are all

8    different.  Every person is different.  Every

9    situation is different, but this one is really

10   different.

11        This one involves the terrorist threat

12   that we Americans face and so this sentencing

13   has particular significance, I think, in the

14   scheme of things.  But as a judge, I've got to

15   go back to the principles that are supposed to

16   guide me in this process, which I'm going to

17   try to do at this point.

18        We've determined the guidelines score,

19   which is a hundred fifty-one to a hundred

20   eighty-eight months, but also note that

21   Count I has a statutory maximum of ten years,

22   Count II has a statutory maximum of eight

23   years.  I guess you can run those

24   consecutively; but, the scoring is grouped.

25        So, that's the baseline that I use in

1          looking at the 3553 factors in my attempt to

2          impose a reasonable sentence.

3              So, let's look at those factors.  First is

4          the seriousness of the offense, and here, we

5          have a rather odd situation, I guess you could

6          say, that on its face a $5,000 one-time income

7          tax fraud would be relatively low on the

8          culpability scale.  I've handled a lot of

9          income tax cases and I've seen -- I mean this

10         is probably maybe one of the least egregious

11         that I've seen on its face, a one-time

12         incident, a relatively small amount of money.

13             Mr. Handberg, however, makes the point

14         that the fact that this money was intended to

15         be used, not only stealing from our own

16         Government, but then to use the stolen money

17         to commit acts of violence against Americans

18         or others raises the culpability of that

19         offense.

20             With respect to lying to the FBI, I don't

21         think legally the fact that the FBI already

22         knew the correct answers mitigates the events

23         much, maybe a little.  Was it a setup?  Yeah.

24         Most of the cases I get, the Defendant is here

25         because somehow he got set up to make a

1    mistake and got caught so that's the way it

2    works.

3          Again, in the scheme of things, telling

4    the FBI a falsehood to cover up for one's own

5    misconduct is not terribly culpable; but, here

6    again, it was in relation to the overall

7    charge by the Government that this was part of

8    the effort to engage in terrorist activities.

9          Now, with respect to the recordings, and

10   this goes to the seriousness of the offense as

11   well as the history and characteristics of the

12   Defendant, and let me say in that latter

13   regard I recognize we're dealing with a

14   relatively young person, uneducated person,

15   who has a serious drug dependency problem and

16   who appears to have been caught up in radical

17   religious teachings, and looking at that

18   together with the crimes, themselves, we have

19   to consider the recordings and the statements

20   made by Mr. Jimenez, which I have endeavored

21   to do, and my take on those recordings is,

22   one, I don't know what Mr. Jimenez was

23   thinking.  Nobody in this courtroom does.  I'm

24   not sure Mr. Jimenez knows; but, he's the only

25   one in a position to know that.

1    And while I concede that there are

2    consistencies and that arguments can be made

3    and were well made by Mr. Sorrell, there is a

4    lot of it, there is a lot of evidence in the

5    recordings that Mr. Jimenez was committing

6    these crimes in relation to terrorism.

7    If it was a casual statement or two said

8    in a joking manner or otherwise, my conclusion

9    might be different; but, the shear number and

10   extent of the conversations concerning

11   Mr. Jimenez' intent to commit jihad is under a

12   preponderance of the evidence standards

13   sufficient for me to conclude that the

14   terrorism enhancement applies and that is

15   Guideline 381.4.

16   Having said that, it also raises in my

17   mind a policy concern I have with that

18   enhancement and other enhancements that tend

19   to work arbitrarily, and I say arbitrarily,

20   because the enhancement applies at a given

21   level, regardless of to what extent the

22   activity was related to terrorism, and in my

23   mind from a policy standpoint, the commission

24   ought to give a district judge some latitude

25   to weigh the extent to which an enhancement

1          should apply, that is, give us a range.

2               Instead of saying you automatically go to

3          32, regardless of how extensive the

4          relationship is, there should be a range.

5               And this is not a new statement on my

6          part.  I've made this statement observation in

7          relation to other enhancements.  Under an

8          advisory guideline scheme, there should be a

9          range so that I can look at the relative

10         extent to which terrorism was involved and

11         apply what -- what I think is appropriate as

12         opposed to black or white 32 or nothing type

13         of rationale.

14              I say that because that does weigh on my

15         Booker discretion here to some extent.

16              So, that basically is the -- my take on

17         the seriousness of the offense and the history

18         and characteristics of the Defendant.

19              I would note that, also, with respect to

20         the latter, Mr. Jimenez' prior criminal

21         history is modest.  He would barely score a

22         three, but for the terrorism enhancement, and

23         again, that goes back to my concern with the

24         arbitrary nature of the enhancement, itself.

25              So, I think that concludes my thoughts on

1        those two factors.

2            Then we get into the deterrence factor.  I

3        don't view deterrence here.  Well, I have

4        trouble applying the deterrence factor here,

5        because what are we deterring; lying to the

6        FBI on income tax fraud, or are we trying to

7        deter terrorism?

8            The trouble is he wasn't charged with

9        terrorism.  He was charged with lying and

10       stealing from the Government.

11           So, to me, from the deterrent standpoint,

12       there is not a really good match here so I

13       don't view that really as aggravating or

14       mitigating.  It is kind of somewhat of a

15       lesser factor.

16           With respect to protection of the public,

17       the 11th Circuit wrote a very long in bank

18       opinion in one of my cases, the Iry case (ph),

19       and there is a lot about that opinion that I

20       don't agree with, which is also well-known;

21       but, in that, I think, a special concurring

22       opinion, Judge Tjoflat made the observation

23       that many sentencings, one of the 3553(a)

24       factors will be the driving concept, and I

25       agree with him about that.

1        There is not always just one or another.

2    Sometimes they all kind of play equally; but,

3    most cases, there is one of the factors that

4    ways more heavily than others, and in this

5    case, I think it is protection of the public.

6        Having listened to the tapes and having

7    seen this, it's my belief that Mr. Jimenez was

8    and is a threat to the public and so that has

9    weighed heavily on my decision making.

10        That's essentially my review of the

11    factors.  Some of the other 3553(a) factors

12    really don't apply here or come into play.  I

13    don't know of another case like this.  No way

14    for me to judge how this should apply versus

15    others in a similar circumstance because of

16    the rather unique circumstance that we find

17    here.

18        So, having said all that, I've come to the

19    conclusion that an appropriate sentence in

20    this case is a hundred twenty months and I

21    could -- it doesn't matter whether I do a

22    hundred twenty months on Count I and 96 months

23    on Count II to run concurrent or whether I

24    impose a sentence of 96 plus 24 consecutive.

25    I don't know that there is any difference in

1    terms of that.

2        So, what I'm going to do is impose a

3    sentence of 96 months on Count I and 24 months

4    on Count II, Count II to run consecutive to

5    Count I.

6        Upon release from prison, Mr. Jimenez,

7    you'll be placed on supervised release for a

8    term of three years.  That term shall consist

9    of three years on each of counts I and II, I

10   and II, and those shall run concurrently.

11       Mandatory drug testing requirements of the

12   Violent Control Crime Act are imposed.

13       Following supervised release, you must

14   comply with the standard conditions adopted by

15   this court.  In addition, you must comply with

16   the following special conditions:

17       First, you shall participate in a mental

18   health treatment program and follow your

19   probation officer's instructions in that

20   regard.

21       Also, you shall participate in a substance

22   abuse program and follow your probation

23   officer's instructions in that regard.

24       You are also ordered to contribute to the

25   cost of those services, not to exceed an

1      amount determined reasonable by the probation

2      officer sliding scale for such treatment.

3          These conditions also would include

4      submission to random drug testing.

5          You must cooperate in the collection of

6      DNA.

7          Based on your financial circumstance, the

8      fine is waived.

9          I'm not going to impose any community

10     service, because I'm not confident Mr. Jimenez

11     should be out providing community service at

12     this point.

13         It is ordered that you pay the United

14     States a special assessment of $200, which

15     shall be due immediately.

16         The mandatory restitution provisions of

17     3663(a) apply in this case and it is ordered

18     that you make restitution in the amount of

19     $5,587 to the Internal Revenue Service, 401

20     West Peachtree Street Northwest, Atlanta,

21     Georgia  30308.  Restitution is payable to the

22     clerk of this court for distribution to the

23     victim.

24         Following the Bureau of Prisons -- while

25     in the custody of the Bureau of Prisons, you

1     shall pay at least $25 quarterly if you have a

2     non-UNICOR job or at least 50 percent of your

3     earnings if you have a UNICOR job.

4          Following release of custody, you are to

5     begin making payments of $200 a month and that

6     payment schedule shall continue until such

7     time as it is modified by the Court based on

8     the change in your financial circumstances.

9          There is no forfeiture here, is there?

10          MR. HANDBERG:  There is not, Your Honor.

11          THE COURT:  Mr. Jimenez is remanded to the

12     custody of the Marshal, awaiting the

13     designation by the Bureau of Prisons.

14          In my judgment, I will recommend that

15     Mr. Jimenez receive -- be allowed to

16     participate in the drug treatment program and

17     that, to the extent available and appropriate,

18     he be housed in a facility in the Greater

19     New York Metropolitan area, Greater New York

20     City Metropolitan area.

21          Other than objections previously raised,

22     is there any objection to the sentence and the

23     manner in which court has pronounced sentence?

24          MR. HANDBERG:  No, Your Honor.

25          MR. SORRELL:  No, Your Honor.

1          THE COURT:  All right, Mr. Jimenez, you

2     have the right to appeal this sentence within

3     14 days from today or from the date the

4     judgment is recorded, whichever is later.  If

5     you fail to appeal within that period, it will

6     be waiver of your right to appeal.

7          The Government can also appeal the

8     sentence.

9          If you wish to take an appeal, you are

10    entitled to assistance of counsel, and if you

11    can not afford a lawyer, one will be provided

12    for you, and I'm sure Mr. Sorrell can fill you

13    in if you have any further questions in that

14    regard.

15         I want to thank Mr. Sorrell for his

16    efforts and Ms. Jacobson and defense counsel's

17    efforts as well as the Government, Government

18    agents for bringing this difficult matter to

19    court.

20         Is there anything else?

21         MR. HANDBERG:  No, Your Honor.  Thank you.

22         MR. SORRELL:  No, Your Honor.

23         THE COURT:  All right.  Be in recess.

24         (Proceedings concluded at 10:20 a.m.)

25

1          CERTIFICATE OF REPORTER

2

3

4

5          I, SANDRA Y. McGAULEY, Certified

6    Shorthand Reporter and Notary Public, declare that

7    I was authorized to and did stenographically report

8    the foregoing hearing held on April 18, 2013,

9    before the Honorable Gregory A. Presnell, Judge of

10   the Court, and that the transcript is a true record

11   of the proceedings had therein.

12          I further declare that I am not a

13   relative, employee, attorney, or counsel of any of

14   the parties, nor am I a relative or employee of any

15   of the parties' attorney or counsel connected with

16   the action, nor am I financially interested in the

17   action.

18

19          Dated:  03/25/2015.

20

21   _____

22   SANDRA Y. McGAULEY, CSR, CP, CM

23

24

25